**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ESSEX INSURANCE COMPANY, as Assignee ) <br> of Skirmish, U.S.A., Inc., ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> LIBERTY MUTUAL INSURANCE COMPANY, ) <br> ) <br> Defendant. ) | **CIVIL DIVISION** <br><br> No. _____ <br><br><br> Judge _____ <br><br> Magistrate Judge <br> _____ |

## ACTION FOR DECLARATORY JUDGMENT

AND NOW, comes the Plaintiff, by and through its attorneys, John G. Shorall, Esquire, of Counsel and Ira Weiss, Esquire of the Law Offices of Ira Weiss, and files the following ACTION FOR DECLARATORY JUDGMENT, averring as follows:

## PARTIES

1.     The Plaintiff, Essex Insurance Company, as Assignee of Skirmish U.S.A., Inc. ("Essex"), is an organization incorporated under the laws of the State of Delaware and is a citizen of the Commonwealth of Virginia with its principal place of business at 4551 Cox Road, Glen Allen, Virginia 23060.

2.     The Defendant, Liberty Mutual Insurance Company ("Liberty"), through Liberty International Underwriters Canada, a division of Liberty, is an organization existing under the laws of the United States with a place of business at 181 Bay Street, Suite 1000, BCE Place, Toronto, Ontario, Canada, M5J 2T3.

## JURISDICTION AND VENUE

3.     Jurisdiction is with this Honorable Court under 28 USC §1332 by virtue of the diversity of the parties and the amount in controversy, exclusive of interest and costs, being alleged to be in excess of $75,000.00.

4.     Venue in this District is proper under 28 USC §1391.

5.     This is an action seeking Declaratory Judgment and is advanced pursuant to 28 USC §2201 et seq. for the purpose of determining a question in actual controversy between the parties, as set forth with particularity herein.

## ALLEGATIONS AND CLAIMS FOR RELIEF

6.     The within described controversy arises under the provisions of Essex Insurance Policy No. 3CQ2257 ("Essex Policy") issued by the Plaintiff, Essex, to the Defendant, Skirmish, U.S.A., Inc., a paintball recreational facility located at Route 903, HC-2, Box 2245, Jim Thorpe, PA 18229 ("Skirmish").

7.     The Essex Policy is a commercial general liability policy issued by Essex to Skirmish, for the policy period commencing March 4, 2005 through March 4, 2006 and amended by Endorsement No. 1 for a policy period of March 24, 2005 through March 24, 2006.  A true and correct copy of the Essex Policy is attached hereto and incorporated herein, as fully as if set forth in all of its particulars, and marked Exhibit A.

8.     The within described controversy also arises under the provisions of Liberty Mutual Insurance Company Policy No. GLTO-472960-007 ("Liberty Policy") issued by the Defendant Liberty to Vision 2 international Inc., 1280 Rue Nobel, Boucherville, Quebec, JHB 5H1 ("Vision 2").

9.     The Liberty Policy is a commercial general liability policy issued by Liberty to Vision 2, for the policy period commencing July 17, 2007 through July 17, 2008, with Retroactive Date of September 1, 2003.  A true and correct copy of the Liberty Policy is attached hereto and incorporated herein as fully as if set out in all of its particulars and marked Exhibit B.

10.     On March 19, 2006, Jorge Martinez ("Martinez") visited Skirmish's paintball recreational facility in Jim Thorpe, PA, for the purpose of engaging in paintball games.

11.     Martinez rented paintball game equipment from Skirmish, including VForce Armore Rental Field Black Goggles ("VForce Goggles") manufactured by Vision 2 and sold to Skirmish by ProCaps, LP, a foreign corporation with its principal place of business located at 6000 Kienan, Ville St. Laurent, Quebec, Canada, H4S 2B5 and by ProCaps Direct USA, a Delaware corporation with its principal place of business located at 14235 John Marshall Highway, Gainsville, VA 20155 (ProCaps, LP and ProCaps Direct USA hereinafter collectively, "ProCaps").

12.     Paintball is a recreational activity in which individuals or teams conduct mock war games utilizing paintball guns to fire rounds of paintballs at opponents with the object of striking opponents and thereby disqualifying them from continued participation in the game.

13.     While participating in a paintball game, Martinez was struck in his right eye by a paintball after his VForce Goggles slipped or moved position exposing a portion of his face, including his right eye.

14.     As a result of the impact of one or more paintballs with Martinez's right eye, he suffered permanent blindness in such eye.

15.     On November 28, 2007, Martinez filed a lawsuit captioned Jorge Martinez v. Skirmish, U.S.A., Inc., at Civil Action No. 07-5003-JP in the United States District Court for the Eastern District of Pennsylvania ("Underlying Martinez Litigation").

16.     On January 25, 2008, Martinez filed his First Amended Complaint in four separate counts alleging, respectively, Negligence; Gross Negligence; Strict Liability; and, Breach of Implied Warranty of Merchantability and Fitness.  Each count sought awards of both compensatory and punitive damages.

17.     Skirmish filed Third Party Complaints against Tippmann Sports LLC ("Tippmann") and ProCaps alleging, respectively, negligence in the design and manufacture of paintball guns; and, of paintballs, paintball guns and goggles.

18.     On January 9, 2009, Martinez filed direct claims against ProCaps upon parallel allegations to the Third Party Complaints.

19.     On January 30, 2009, Skirmish sought Summary Judgment on all claims raised by Martinez, and on June 15, 2009, the Court entered an Order granting, in part, such Motion, and, in part, denying such Motion preserving Martinez's claims against Skirmish for Gross Negligence, Strict Liability, and Breach of Warranty claims relating to the VForce Goggles.

20.     Secondary to the Order of June 15, 2009, Judge Padova authored a Memorandum dated June 15, 2009, addressing, in a thorough manner, the claim of Strict Liability regarding the use of VForce Goggles by holding as follows:

"C.   Strict Liability

Count III of the First Amended Complaint asserts a claim for strict liability against Skirmish arising from Martinez's rental of the VForce Armor Rental Field Black Goggles. Martinez contends that Skirmish is strictly liable to him because the goggles it rented to him were defectively designed.

Martinez claims that, but for the defective design of the VForce Armor Rental Field Black Goggles provided by Skirmish, the goggles would not have slipped below his eyes, exposing his right eye to paintball fire.

After weighing all seven of the Azzarello factors, we conclude that the defects in design of the VForce Armor Rental Field Black Goggles outweigh its social utility and, accordingly, that the VForce Armor Rental Field Black Goggles Skirmish rented to Martinez on March 19, 2006 were unreasonably dangerous."

21.     Tippman sought Summary Judgment on the claims raised in the Third Party Complaint, and on May 21, 2009, the Court granted such Motion dismissing all claims against Tippmann.

22.     ProCaps sought Summary Judgment on the claims raised in the Third Party Complaint and on the direct claims of Martinez, and on June 1, 2009, the Court granted such Motion dismissing all claims against ProCaps.

23.     Skirmish sought reconsideration of the Court's June 15, 2009, Order denying, in part, Skirmish's Motion for Summary Judgment, and on August 16, 2009, Judge Padova issued a Memorandum providing, in pertinent part, as follows:

"There is also evidence on the record before us that the VForce Armor Rental Field Black Goggles Skirmish rented to Plaintiff were defectively designed in that they did not contain a vertical restraint that would prevent them from moving vertically on the wearer's face.  (12/8/08 Trident Rpt. At 7 ¶ f.)  The design thus allowed the goggles to slip during circumstances common to participation in paintball.

> Finally, there is evidence that alternative goggle designs existed at
> the time of Plaintiff's injury that would have cured the vertical
> restraint defects of the VForce Armor Rental Field Black Goggles,
> and that goggles using these designs were being manufactured
> and sold at the time of Plaintiff's injury.  (Id. At 8¶j.)"

24.     On August 19, 2009, Essex tendered defense and indemnification of the Underlying Martinez Litigation to Liberty pursuant to the Liberty Policy, and with particularity, the definition of Insured including "Vendor", based upon Skirmish being a vendor of the VForce Goggles manufactured by Vision 2 and alleged by Martinez in the Underlying Martinez Litigation to be defective and causal in the injuries and damages sustained by Martinez.

25.     On August 27, 2009, Essex corresponded with Liberty advising Liberty of a scheduled Settlement Conference before Judge Padova on September 1, 2009, and invited Liberty's participation in evaluation of the claims for injuries and damages involved in the Underlying Martinez Litigation and attendance at the above described Settlement Conference.

26.     On August 31, 2009, Liberty International Underwriters, on behalf of Liberty, acknowledged receipt of the tender of defense and indemnification by Essex to Liberty with regard to Skirmish as defendant in the Underlying Martinez Litigation and declined participation in claim evaluation or attendance at the above described Settlement Conference.

27.     The Underlying Martinez Litigation was scheduled for jury trial to commence on or about October 19, 2009, and in advance thereof, on September 1, 2009, the parties in Settlement Conference before Judge Padova amicably resolved the Underlying Martinez Litigation through payment by Essex on behalf of Skirmish, of the

amount of Eight Hundred Fifty Thousand Dollars ($850,000.00) in exchange for delivery, by Martinez, of a Release and Settlement Agreement ("Release").

28.     The Release provides, in pertinent part:

> "This Release has no effect whatsoever on Skirmish, U.S.A., Inc., Markel Insurance and/or Essex Insurance Company from pursuing or prosecuting any claims against ProCaps, any of their affiliates and/or Vision2 and/or their successors in interest, predecessors in interest and/or insurance companies.  None of these entities are parties to this Release and cannot benefit from any of the Release's language."

29.     On or about October 23, 2009, Essex and Skirmish entered into an Assignment ("Assignment") whereby Skirmish assigned and transferred to Essex, pursuant to Section V, Paragraph 8 of the Essex Policy, any rights of Skirmish to recovery of payments made on its behalf by Essex in the defense and settlement of the Underlying Martinez Litigation and any fees and costs associated therewith as such monies may be due from Liberty based upon Skirmish's status as Insured under the Liberty Policy.  A true and correct copy of the Assignment is attached hereto and incorporated herein as fully as if set out in all of its particulars, and marked as Exhibit C.

30.     On or about November 2, 2009, Essex forwarded to Liberty copies of the Order and Memorandum of Judge Padova dated June 15, 2009, and a copy of the deposition transcript, with Exhibits, of Paul Fogal, President of Skirmish, for Liberty's use in coverage analysis under the Liberty Policy.

31.     To date, Liberty has not accepted Essex's tender of defense and indemnification of Skirmish in the Underlying Martinez Litigation.

## THE UNDERLYING MARTINEZ LITIGATION

32.   The Underlying Martinez Litigation alleged, in pertinent part:

8.    Skirmish charges admission for the use of its paintball facility, rents and sells paintballs guns, goggles, and other paintball equipment and attire.  For the purpose of this Complaint the word "goggles" is intended to mean and include goggles, straps, masks or lens assemblies.

13.   Plaintiff rented from Skirmish a paintball gun, goggles and purchased paintballs.

16.   Plaintiff spoke to one of the Referees, telling the Referee that his goggles were slipping from his face.

17.   Instead of stopping the paintball activity and addressing the slippage of Plaintiff's goggles, the Referee waived Plaintiff away, and took no steps to protect Plaintiff.

18.   The goggles then slipped from Plaintiff's face sufficiently to expose his right eye to paintball fire, and Plaintiff was shot a number of times in the head and face by other participants.

19.   One or more paintballs struck Plaintiff in the right eye, and Plaintiff has been permanently blinded in that eye.

22.   The acts and inactions by Skirmish, through its employees and agents, which were a proximate cause of the injuries suffered by Plaintiff include, inter alia, the following:

a.    The rental to Plaintiff of dangerous and defective goggles;

b.    The failure to warn Plaintiff of the risks posed by the dangerous and defective goggles rented to Plaintiff;

c.    The failure to maintain the goggles rented to Plaintiff in a condition that would prevent the goggles from slipping on Plaintiff's face;

d.    The failure to provide equipment or materials to Plaintiff so as to prevent the goggles from slipping on Plaintiff's face;

e. The failure to fit the goggles rented to Plaintiff so as to prevent the goggles from slipping on Plaintiff's face;

f. The failure to inspect the goggles rented to Plaintiff in order to discover that the goggles were dangerous and defective prior to renting the goggles to Plaintiff;

g. The failure to train Skirmish's employees and agents to properly inspect goggles for defects and dangerous conditions;

h. The failure to train Skirmish's employees and agents to properly fit goggles to its customers;

i. The failure to train Skirmish's employees in methods and materials to prevent slipping of goggles rented or sold to its customers.

28. Skirmish is strictly liable in tort to Plaintiff pursuant to Sec. 402A of the Restatement (Second) of Torts as adopted by the Courts of the Commonwealth of Pennsylvania.

29. At all times relevant hereto Skirmish was in the business of renting goggles.

30. The goggles rented to Plaintiff by Skirmish were in a defective condition and unreasonably dangerous to Plaintiff.

31. Plaintiff made no substantial change to the condition of the goggles before his injury.

38. As a direct result of the defective and unreasonably dangerous condition of the goggles, and/or the paintball guns and/or the paintballs, Plaintiff has suffered the injuries described above.

40. Skirmish, as a merchant of goggles, paintball guns and paintballs, has made the implied warranties that such products are merchantable and fit for the specific purpose for which they are intended.

41. Skirmish materially breached these implied warranties by providing products which were defective and unreasonably dangerous to Plaintiff.

42.     As a direct result of these breaches of warranty Plaintiff
        has suffered the injuries described above.

**THE ESSEX POLICY**

33.     The Essex Policy provides, in pertinent part:

Section IV - Commercial General Liability Conditions

    4.     Other Insurance

        If other valid and collectible insurance is available
        to the Insured for a loss we cover under Coverages
        A or B of this Coverage Part, our obligations are
        limited as follows:

        a.     Primary Insurance

            This insurance is primary except when b.
            below applies.  If this insurance is primary,
            our obligations are not affected unless any
            of the other insurance is also primary.
            Then, we will share with all that other
            insurance by the method described in c.
            below.

        b.     Excess Insurance

            This insurance is excess over any of the
            other insurance, whether primary, excess,
            contingent or on any other basis:

            (1)     That is Fire, Extended Coverage,
                Builder's Risk, Installation Risk or
                similar coverage for "your work";

            (2)     That is Fire Insurance for premises
                rented to you or temporarily
                occupied by you with permission of
                the owner; or

            (3)     If the loss arises out of the
                maintenance or use of aircraft,
                "autos" or watercraft to the extent
                not subject to Exclusion g. of
                Coverage A (Section I).

When this insurance is excess, we will have no duty under Coverages A or B to defend the Insured against any "suit" if any other insurer has a duty to defend the Insured against the "suit". If no other insurer defends, we will undertake to do so, but we will be entitled to the Insured's rights against all those other insurers.

(1)     The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2)     The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

c.     Method of Sharing

If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

8.     Transfer Of Rights Of Recovery Against Others To Us

If the Insured has rights to recover all or part of any payment we have made under this Coverage

Part, those rights are transferred to us.  The Insured must do nothing after loss to impair them. At our request, the Insured will bring "suit" or transfer those rights to us and help us enforce them.

**THE LIBERTY POLICY**

34.     The Liberty Policy provides, in pertinent part:

**SECTION VII - DEFINITIONS**

When used in this Policy the words and phrases appearing in quotation marks have the defined meanings shown below:

8.     "Insured" means:

    (a)     the Named Insured;

    (b)     any organization in which the Named Insured holds a majority interest as of the effective date of this Policy and to which more specific insurance does not apply;

    (l)     any vendor, but only with respect to "bodily injury" or "property damage" arising out of the distribution or sale of the "Insured's products" in the regular course of that vendor's business and only if "products and completed operations hazard" coverage is provided under this Policy.

No vendor is an "Insured" with respect to:

    *     "bodily injury" or "property damage" for which the vendor is obligated to pay damages by reason of the assumption of liability in a contract or agreement; however, this exclusion does not apply to liability for damages the vendor would have in the absence of such contract or agreement;

    *     any express warranty unauthorized by the Named Insured;

    *     any physical or chemical change in the "Insured's products" made intentionally by the vendor;

&ast;     repacking, unless unpacked solely for the purpose of inspection, demonstration, testing or the substitution of parts under instruction from the manufacturer and then repacked in the original container;

&ast;     demonstration, installation, servicing or repair operations, except such operations performed at the vendor's premises in connection with the sale of the "Insured's products";

&ast;     the "Insured's products" which after distribution or sale by the Named Insured have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance, by or for the vendor;

&ast;     any failure to make such inspections, adjustments, tests or servicing as the vendor has agreed to make or normally makes in the usual course of business, in connection with the distribution or sale of the "Insured's products; or

&ast;     any of the "Insured's products" or completed operations contained within the "products and completed operations hazard" which are excluded under this Policy.

10.    "Insured's product" means goods or products, other than real property, manufactured sold, handled or distributed or disposed of by the Named Insured or an organization described in Definition 8.(b) or 8.(c) above or by others trading under the name of the Named Insured or an organization described in Definition 8.(b) or 8.(c) above, including any container thereof (other than a vehicle), materials, parts or equipment furnished in connection with such goods or products. "Insured's product" includes warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of the product and the provision or failure to provide warnings or instructions. "Insured's product" does not include vending machines or other property rented to or located for use of others but not sold.

15.　"Occurrence" means:

(a)　with respect to "bodily injury", "property damage" or "employer's liability", an accident, including conditions or repeated exposure to substantially the same general harmful conditions.  All damages arising out of the same or related acts or omissions of the Insured or out of one lot of goods or products manufactured, prepared or acquired by the "Insured" shall be deemed to arise out of one "occurrence."

(b)　with respect to "personal injury" or "advertising injury", a covered offense.  All damages that arise from the same or related act, publication or general conditions will be deemed to arise out of the same "occurrence", regardless of the frequency or repetition thereof, the number or kind of media used or the number of claimors.

16.　"Other Insurance" means a policy of valid and collectible insurance affording coverage that this Policy also affords and includes any type of self-insurance or other mechanism by which an "Insured" arranges for funding of legal liabilities.

19.　"Products and completed operations hazard" means all "bodily injury" and "property damage" occurring away from premises the "Insured" owns or rents and arising out the "Insured's product" or "Insured's work" except:

(a)　products that are still in the "Insured's" physical possession; or

(b)　work that has not yet been completed or abandoned.  The "Insured's work" will be deemed completed at the earliest of the following times:

(i)　when all of the work to be performed by or on behalf of the "Insured" under the contract has been completed;

(ii)　when all of the work to be performed by or on behalf of the "Insured" at the site has been completed if the contract calls for work at more than one site; or

      (iii)    when that part of the work done at a site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be deemed complete.

This hazard does not include "bodily injury" or "property damage" arising out of the pick-up, delivery or transportation of property or the existence of tools, uninstalled equipment or abandoned or unused materials.

## SECTION VIII - CONDITIONS

This policy is subject to the following conditions:

12.    Other Insurance:

The coverage afforded by this Policy is primary Insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this Insurance is primary and the "Insured" has other insurance, which is applicable to a loss on an excess or contingent basis, the Limits of Liability under this Policy will not be reduced by the existence of such other insurance. When insurance provided by this Policy and by "other insurance" apply to a loss on the same basis, whether primary, excess or contingent, the Insurer will be liable under this Policy for the proportion of such loss stated in the applicable contribution provided below.

(a)    Contribution by Equal Shares:

If all "other insurance" provides for contribution by equal shares, the Insurer will also follow this method. Under this method, each Insurer contributes equal amounts until it has paid it applicable limit of liability or the full amount of the loss is paid, whichever comes first.

(b)    Contribution by Limits:

If any "other Insurance" does not provide for contribution by equal shares, the Insurer will contribute by limits.  Under this method, each Insurer's share is based on the ratio of its applicable limit of liability to the total limits of liability of all insurers.

13.    Severability of Insureds:

Except with respect to the Limits of Liability and to any rights or duties specifically assigned to the first Named Insured, this Insurance applies:

(a)    as if each "Insured" were the only "Insured"; and

(b)    separately to each "Insured" against when claim is made or "suit" is brought.

## COUNT I
## BREACH OF CONTRACT

35.    Paragraphs 1 - 34 of this Action for Declaratory Judgment are incorporated herein as fully as if set out in all of their respective particulars.

36.    Pursuant to Section VII, Paragraph 8 (l) of the Liberty Policy, Skirmish, as Vendor, is an "Insured" under the terms and conditions of the Liberty Policy.

37.    Pursuant to Section VII, Paragraph 10, the VForce Goggles manufactured by Vision 2 and rented by Skirmish to Martinez on May 19, 2006, are an "Insured product" under the terms and conditions of the Liberty Policy.

38.    Pursuant to Section VII, Paragraph 15 (a) of the Liberty Policy, the accident and resulting injury to Martinez occurring on May 19, 2006, at Skirmish's paintball recreational facility is an "Occurrence" under the terms and conditions of the Liberty Policy.

39.     Pursuant to Section VII, Paragraph 16 of the Liberty Policy, the Essex Policy is "Other insurance" under the terms and conditions of the Liberty Policy.

40.     Pursuant to Section VIII, Paragraph 12 of the Liberty Policy, the Liberty Policy is primary insurance.

41.     Pursuant to Section IV, Paragraph 4 of the Essex Policy, the Essex Policy is primary insurance.

42.     Pursuant to Section VII, Paragraph 12 (a) of the Liberty Policy, contribution by primary insurance is to be in equal shares.

43.     Pursuant to Section IV, Paragraph 4 c of the Essex Policy, the method of sharing by primary insurer is to be in equal shares.

44.     Pursuant to Section IV, Paragraph 8 of the Essex Policy, Skirmish's rights to recover all or part of any payment made by Essex on account of a loss to which the Liberty Policy also applies are transferred to Essex.

45.     The Assignment accomplished such transfer of Skirmish's rights as an "Insured" under the Liberty Policy to Essex.

46.     Essex hereby makes claims against Liberty pursuant to the Assignment and the tender of defense and indemnification of the Underlying Martinez Litigation.

47.     Pursuant to the terms and conditions of the Essex Policy and of the Liberty Policy, Liberty's failure to accept the tender and defense of the Underlying Martinez Litigation constitutes a breach of contract of the Liberty Policy to the detriment of Skirmish, and by Assignment, to the detriment of Essex.

48.     As a direct result of Liberty's breach of contract in failing to accept the tender of defense and indemnification of the Underlying Martinez Litigation pursuant to

the requirement of, and duties imposed, under the Liberty Policy, Essex has incurred monetary damages and losses.

49.     Pursuant to the terms and conditions of the Liberty Policy and the Essex Policy, Liberty and Essex are to share costs of defense and indemnity in the Underlying Martinez Litigation in equal shares.

50.     Essex has paid Two Hundred Forty-Four Thousand One Hundred Seventy-One Dollars and Eighty-One Cents ($244,171.81) on behalf of Skirmish in defense of the Underlying Martinez Litigation.

51.     Essex has paid Eight Hundred and Fifty Thousand Dollars ($850,000.00) in settlement, i.e. indemnification, of the Underlying Martinez Litigation.

52.     Pursuant to the aforementioned and described tender of defense and indemnification of the Underlying Martinez Litigation, Essex, as assignee of Skirmish, is entitled to One Hundred Twenty-Two Thousand Eighty-Five Dollars and Ninety Cents ($122,085.90), i.e. one-half equal share, of the funds expended on behalf of Skirmish in defense of the Underlying Martinez Litigation.

53.     Pursuant to the aforementioned and described tender of defense and indemnification of the Underlying Martinez Litigation, Essex, as assignee of Skirmish, is entitled to Four Hundred Twenty-Five Thousand Dollars ($425,000.00), i.e. one-half equal share, of the funds expended on behalf of Skirmish in settlement, i.e. indemnification, of the Underlying Martinez Litigation.

54.     Accordingly, as a direct result of the breach of contract by Liberty, Essex, as assignee of Skirmish, is entitled to Five Hundred Forty-Seven Thousand Eighty-Five Dollars and Ninety Cents ($547,085.90) in damages from Liberty.

WHEREFORE, the Plaintiff, Essex Insurance Company, as Assignee of Skirmish, U.S.A., Inc., demands judgment against the Defendant, Liberty Mutual Insurance Company in an amount to be determined by the Court.

Respectfully submitted:

Dated:   March 10, 2010                    By:_____
                                                John G. Shorall, Esquire, of Counsel
                                                Pa. I.D. #23634

**LAW OFFICES OF IRA WEISS**
Fort Pitt Commons Building
445 Fort Pitt Boulevard, Suite 503
Pittsburgh, PA 15219
412-391-9890 (O)
412-391-9865 (F)
jshorall@weisslawoffices.com

Attorneys for Plaintiff,
Essex Insurance Company

## CERTIFICATE OF SERVICE

I, John G. Shorall, Esquire, do hereby certify that a true and correct copy of the

foregoing ACTION FOR DECLARATORY JUDGMENT was served by U.S. First Class Mail,

on this __10th__ day of __March__ , 2010 upon the following:


James Champion, Senior Claims Specialist
US Casualty Claims
Liberty International Underwriters, a Division of
Liberty Mutual Insurance Company
181 Bay Street, Suite 100
Brookfield Place
Bay Wellington Tower
Toronto, Ontario  M5J 2T3



Respectfully submitted,


By:_____

John G. Shorall, Esquire, of Counsel